**MITCHELL MACHINERY, INC.; Kasperson's, Inc.; Brookings Ford Tractor, Inc.; and A & F, Inc., Appellants,**

**v.**

**FORD NEW HOLLAND, INC. and Versatile Farm Equipment Corp., Appellees.**

No. 89–5440.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1990.

Nov. 19, 1990.

Steven Johnson, Yankton, S.D., for appellants.

Edward Pluimer, Minneapolis, Minn., for appellees.

Before BEAM, Circuit Judge, and ROSS, Senior Circuit Judge, and RENNER,* District Judge.

ROSS, Senior Circuit Judge.

Appellants, former dealers of agricultural equipment and parts manufactured by Versatile Corporation, appeal from the district court's[1] decision to grant summary judgment in favor of appellee, Ford New Holland, Inc., purchaser of Versatile's assets. The district court found that Ford New Holland was not liable to appellants under South Dakota's franchise law and was not a successor corporation to Versatile. Furthermore, the court found that Ford New Holland had not tortiously interfered with appellants' business relationships with Versatile. We affirm.[2]

I.

Versatile Corporation, a Canadian corporation, manufactured Versatile agricultural equipment and parts at its plant in Winnipeg, Manitoba. The four appellant dealers, all located in South Dakota, had sales and service agreements with Versatile Farm Equipment Corporation, a Missouri corporation and a subsidiary of Versatile Corporation (collectively referred to as "Versatile"). The dealer agreements provided that the dealers could only be terminated for cause.

The poor farm economy in the 1980's caused a drastic decrease in demand for Versatile products, and in July, 1986, Versatile ceased all production at its Winnipeg plant when it began experiencing financial difficulty. Versatile then began looking for a buyer of its assets, including its farm equipment business. Ultimately, New Holland of Canada, Ltd., a Canadian corporation and an affiliate of Ford New Holland, appellee herein, (collectively referred to as

* The HONORABLE ROBERT G. RENNER, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. The appeal was filed with this court pursuant to a 54(b) certification from the district court. Fed.R.Civ.P. 54(b). Jurisdiction in this court is invoked pursuant to 28 U.S.C. § 1291.

"Ford New Holland") purchased selected Versatile assets, including most of its farm equipment manufacturing facilities, for approximately $105 million in cash and the assumption of approximately $115 million in liabilities. Ford New Holland did not purchase assets related to the manufacture or distribution of Versatile's "Noble" line of farm implements, nor did it purchase certain buildings and facilities related to Versatile's farm equipment business, Canadian and U.S. parts distribution facilities, or certain retail receivables in the credit company. No stock of any kind was exchanged or made part of the purchase price.

On March 23, 1987, Versatile and Ford New Holland entered into an interim operating agreement for Versatile's Winnipeg manufacturing facility. Under the agreement, Ford New Holland agreed to guarantee a $22.5 million loan made to Versatile to allow the start-up of the manufacturing plant. The agreement further provided that Versatile must review with, and obtain prior recommendations from, Ford New Holland with respect to a long list of operational and marketing matters, including "placement and termination of existing dealers or distributors or franchising of new dealers or distributors." The funding agreement provided that Ford New Holland would assume control over these operating activities in order to secure its interest in this loan agreement.

Ford New Holland's acquisition of Versatile assets required approval from the Department of Justice. In seeking this approval, Ford New Holland submitted a written presentation, dated February 4, 1987, and entitled "Advantages of Acquisition of Versatile Farm Equipment." This document included the following statement: "The acquisition by FNH is less disruptive [than an acquisition by John Deere] since a lack of product line conflict eliminates threat to independent VFE dealers."

Furthermore, as expressed in the February 16, 1987 letter of intent, one of the conditions of purchase was that Ford New Holland must obtain a loan from the Canadian government. Ford New Holland was in competition with other potential purchasers of Versatile for this government loan. The Canadian government expressed concern whether the purchaser would keep production facilities, Versatile employees, and dealers in place if the loan were granted. In answer to this concern, Ford New Holland developed the following response concerning Versatile dealers:

Because we do not have a conflict in our product lines, this distribution will not pose a threat to existing Versatile dealers. The existing Versatile dealer, if he is doing a good job in his market today, will continue selling the Versatile line.

On May 21, 1987, the Canadian government and Ford New Holland entered into a loan agreement for $45,500,000 (Canadian) in consideration for the purchase of Versatile's assets. The loan agreement provided that "[t]his plan is not intended ... to restrict the right of FNH or the Borrower to terminate specific Versatile dealers for non-performance or other valid business reasons or objectives."

Ford New Holland selected 309 of Versatile's dealers with whom it wanted to do business in the future, and accordingly, purchased the rights to those sales and service agreements. The rights to the remaining 150 dealers' sales and service agreements, including appellants, remained with Versatile. Versatile agreed to indemnify Ford New Holland and its affiliates from any claims brought by the dealers whose agreements were not assumed.

On May 21, 1987, Versatile and Ford New Holland entered into an asset purchase agreement (purchase agreement) which specifically set forth the assets to be acquired, including, "all right, title and interest in, to and under the agreements of Seller with authorized dealers of products of the Business [in the U.S.A. and Canada] ... but excluding [the 150 dealers] referred to in Part II of Schedule 7.01(n)." The purchase agreement specifically excluded from the exchange Ford's liability under Versatile's sales and service agreements with the dealers left behind. It also stated that Versatile assumed full responsibility for all claims pertaining to dealer litigation.

Holdback provisions were included to fund Versatile's indemnification of Ford New Holland for this assumed liability.

On May 22, 1987, Versatile sent termination notices to 121 United States dealers, including the four appellants herein. All contractual and statutory obligations to repurchase parts and equipment from the terminated dealers were satisfied. The closing of the asset purchase agreement occurred on July 10, 1987. Despite the sale of various assets, in the summer of 1987 Versatile declared bankruptcy under Canadian law for purposes of reorganization.

Appellant dealers filed this action on June 3, 1988 against Versatile and Ford New Holland, alleging that both defendants had violated South Dakota farm implement dealer laws, S.D. Codified Laws Ann. § 37-5-3, and that Ford New Holland had tortiously interfered with their business relationships with Versatile. The district court granted summary judgment in favor of Ford New Holland, finding that the appellants lacked privity with Ford New Holland regarding the dealership agreements and hence Ford New Holland could not be held liable under South Dakota franchise law. The court also found that Ford New Holland was not a successor corporation, and that any interference by Ford New Holland with appellants' business relationships was for a valid business purpose. This appeal followed.

## II.

■ Appellants first argue that Ford New Holland has direct liability under S.D. Codified Laws Ann. § 37-5-3, which provides in relevant part:

> It is a class 1 misdemeanor for any manufacturer, factory, branch, distributor or distributor-branch, or any field representative, officer, agent, or representative of any of them, unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer in ... farm tractors, or farm implements.

Recognizing that section 37-5-3 imposes liability only on one who "cancels" the dealer agreement, appellants claim that Ford

New Holland became a party to the dealer agreement between appellants and Versatile by either express or implied assumption of those agreements. The appellants contend that Ford New Holland, not Versatile, actually made the termination decisions, identified dealers to be terminated, directed Versatile to make the terminations and assisted in drafting the termination letters. They argue that Ford New Holland had final authority over dealership terminations and that Versatile was merely an instrumentality used by Ford New Holland to dispose of the unwanted dealers. Moreover, appellants urge that Ford New Holland's representations to the press and to the United States and Canadian governments that the dealership network would be maintained, constitutes an express assumption of the dealer agreements.

We are not persuaded by the appellants' arguments. Even when viewed in the light most favorable to the appellants, the evidence does not establish that Ford New Holland had either an express or implied contractual relationship with the appellants. There is no language in the contract between Ford New Holland and Versatile which suggests that Ford New Holland assumed any liability for the appellant dealership contracts. In fact, the purchase agreement expressly excludes the sales and service agreements with the terminated dealers from the asset purchase. Although Ford New Holland knew of the Versatile termination letters and reviewed drafts before they were mailed, this does not constitute either an express or an implied assumption of the Versatile dealer contracts.

Clearly, it is not possible to impose direct liability for "cancelling" an agreement on one who is not a party to the agreement. Because Ford New Holland neither expressly nor impliedly assumed the dealership agreements, it could not have cancelled those agreements and therefore cannot be held directly liable under section 37-5-3.

We also reject appellants' reliance on *Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159 (S.D.1987), for the proposition that section 37-5-3 forbids *any* manufac-

turer from cancelling the franchise of any dealer, including Ford New Holland, notwithstanding the lack of privity of contract between Ford New Holland and appellants.

In *Groseth*, a terminated dealer brought an action against its former franchisor, International Harvester, and another action against the purchaser of the franchisor, Case/Tenneco, alleging that its franchise agreement had been terminated without just provocation in violation of section 37–5–3. The Supreme Court of South Dakota reversed the trial court's grant of summary judgment in favor of Case/Tenneco, finding that Case/Tenneco had assumed the obligations under the dealer agreement.

Contrary to appellants' argument, however, the facts of *Groseth* are clearly distinguishable from the case before us. The South Dakota Supreme Court found that Case/Tenneco either expressly or impliedly assumed International Harvester's contract obligations to its dealers. The purchase agreement required the purchaser, not the seller, to negotiate terminations with the seller's present dealers. Case/Tenneco employees met personally with the dealers to be terminated and attempted to negotiate settlements with them. *Id.* at 162–63, 169–71. Case/Tenneco attempted to exclude dealer agreements from the list of assets purchased, but because the agreement elsewhere expressly provided that the purchaser assumed obligations relating to the dealer, the court found the prior exclusion ineffective. *Id.* at 170–71. Therefore, in contrast to the instant case, the purchasing corporation in *Groseth* contractually assumed responsibility for the terminated dealers.

Because there was no such assumption here, *Groseth* is not persuasive authority that Ford New Holland can be directly liable for Versatile's cancellation of its contracts with appellants. Appellants never contracted with Ford New Holland and in fact the purchase agreement with Versatile expressly disavowed any right in or liability under appellants' dealer contracts.

### III.

■ Appellants also argue that Ford New Holland is liable under section 37–5–3

as a successor corporation to Versatile. It is well established under South Dakota law that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. *Hamaker v. Kenwel–Jackson Mach., Inc.*, 387 N.W.2d 515, 518 (S.D.1986). There are, however, four exceptions to the general rule of nonliability:

> (1) [W]hen the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

*Id.*

We have already discussed, and rejected, appellants' contention that Ford New Holland either expressly or impliedly assumed the appellants' dealer contracts. Accordingly, we find that appellants do not fit within the first exception to the general rule against nonliability.

■ We also reject the contention that the transaction between Ford New Holland and Versatile amounted to a merger of the two corporations, or that Ford New Holland is a mere continuation of Versatile. The South Dakota Supreme Court explained that a merger "involves the actual absorption of one corporation into another, with the former losing its existence as a separate corporate identity. When the seller corporation retains its existence while parting with its assets, a 'de facto merger' may be found if the consideration given by the purchaser corporation is shares of its own stock." *Id.*

It cannot be persuasively argued that Versatile was "actually absorbed" into Ford New Holland. No stock in Versatile was transferred as consideration for Versatile's assets, but instead, the transaction was a purchase of assets with cash and the assumption of certain debts. Moreover,

significant areas of Versatile's business, such as shipbuilding and the Noble operations, were untouched by the asset purchase.

■ It is equally clear that Ford New Holland is not a "mere continuation" of Versatile. "The key element of a 'continuation' is a commonality of the officers, directors, and stockholders in the predecessor and successor corporations." *Id.* (no successor liability even though three employees of the purchaser corporation were previously employed by the seller corporation). Although Ford New Holland hired the former president of Versatile, and now operates out of the same Winnipeg facilities as did Versatile, these facts are insufficient to create a factual issue as to whether or not Ford New Holland is merely a continuation of Versatile. We conclude, as did the district court, that the transaction between Versatile and Ford New Holland was solely a purchase of designated assets and was not a consolidation or merger, nor a mere continuation of the seller corporation.

■ Finally, as to fraud, the appellants argue that the transaction between Versatile and Ford New Holland was entered into fraudulently to escape liability for the Versatile dealer contracts. We find no factual basis in the record to support such a claim. It is undisputed that Ford New Holland paid a fair price for the assets of Versatile, just as it is undisputed that Versatile's decline in business mandated that it sell those assets in order to satisfy its creditors. Clearly, this transaction was not a sham intended to avoid liability for dealership terminations. This was an arms-length transaction entered into for legitimate business purposes.

We conclude that Ford New Holland is not liable under section 37–5–3 as a successor corporation to Versatile.

### IV.

■ Finally, appellants allege that Ford New Holland tortiously interfered with their business relationships with Versatile in the terminations of their sales and service agreements. In *Groseth, supra,* 410 N.W.2d at 172, the South Dakota Supreme Court stated that the tort of intentional interference with a business relationship requires "an intentional interference with the business relationship which results in damage to the plaintiff to establish a prima facie case." Furthermore, the interference must have been improper or committed without reasonable justification or excuse. *Lien v. Northwestern Eng'g Co.,* 73 S.D. 84, 39 N.W.2d 483, 485 (1949); Restatement (Second) of Torts § 766B.

■ Even when viewed in the light most favorable to the appellants, the facts do not demonstrate that any interference with the appellants' business relationships with Versatile was anything other than an incidental result of the bona fide purchase agreement between Ford New Holland and Versatile. It would be unsound to hold that a purchasing company's failure to acquire every dealership contract results in a cognizable claim of tortious interference with the dealers' business relationships.

### V.

In conclusion, we hold that Ford New Holland was not liable to appellants under South Dakota law and that its motion for summary judgment was properly granted. The judgment of the district court is affirmed.